# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| In re | Case No. 21-30731-BPC |
| | Chapter 13 |
| HAZEL MARIE ROBY,<br>　　　　Debtor. | |
| _____ | |
| In re | Case No. 21-31026-BPC |
| | Chapter 13 |
| KIMBERLY HOPE ARNETT,<br>　　　　Debtor. | |
| _____ | |
| In re | Case No. 21-31053-BPC |
| | Chapter 13 |
| LENTONIUS FARYETT SMITH,<br>　　　　Debtor. | |

## MEMORANDUM OPINION AND ORDER OVERRULING TITLEMAX'S OBJECTIONS TO CONFIRMATION

The above cases are before the Court for plan confirmation. In each case are pending objections to confirmation by TitleMax of Alabama, Inc. ("TitleMax"). TitleMax argues Debtors' proposed plans should not be confirmed due to bad faith and fraud.[1] The Court has reviewed the records, including the transcripts and admitted exhibits from the evidentiary hearings prior to appeal, in addition to the petitions, schedules, statements, and proposed plans in each case.[2] For the reasons set forth below, TitleMax's objections will be overruled, and the Court finds the plans are due to be confirmed.

---

[1] Because TitleMax asserted similar objections and arguments in each case, the Court will address the arguments in one opinion.

[2] A court may take judicial notice of its own records. *United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987); *Cash Inn of Dade, Inc. v. Metro. Dade Cty.*, 938 F.2d 1239, 1243 (11th Cir. 1991) ("A district

1

# I.    JURISDICTION

This Court has jurisdiction to hear these matters pursuant to 28 U.S.C. § 1334(b). These are core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(L). This is a final order.

# II.    FACTS

## A.    Hazel Marie Roby—Case No. 21-30731

The Joint Stipulation of Facts provided by the parties states that Hazel Marie Roby ("Roby") first pawned the title to her 2013 BMW 7-Series to TitleMax on October 12, 2020. (Roby; Doc. 48). Roby renewed pawn agreements with TitleMax, pledging title to the same vehicle on November 5, 2020, December 1, 2020, December 29, 2020, January 25, 2021, January 28, 2021, February 22, 2021, March 21, 2021, and finally on April 23, 2021. *Id*. Roby's March agreement matured on April 20, 2021. (Roby; Doc. 18). Days later, and prior to the expiration of her redemption period, Roby entered into another (and final) pawn agreement with TitleMax on April 23, 2021, that refinanced the amounts owed on the prior agreement which had matured on April 20, 2021. In the final agreement, she agreed to repay $7,397.72, plus a pawnshop fee of $813.01, on or before May 23, 2021, in order to redeem the vehicle. (Roby; Doc. 48). Roby completed this transaction electronically on a mobile TitleMax app and not at a store location. (Roby; Doc. 70). At

court may take judicial notice of public records within its files relating to the particular case before it or other related cases."); FED. R. EVID. 201(b).

the time of this final agreement, Roby declined to accept any new cash and only refinanced the prior amount due. *Id.*

Also on April 23, 2021, Roby filed a Chapter 13 bankruptcy petition. The day prior to her bankruptcy filing and prior to signing the final agreement with TitleMax, Roby completed a credit counseling course with Access Counseling, Inc. (Roby; Doc. 48). Bankruptcy Form 106 summarizes Roby's assets are valued at $230,050 and her liabilities total $46,850. (Roby; Doc. 14). The same form states she has been employed by Baptist Health for 31 years and her take-home pay is $1,987.43 per month. *Id.* In addition to income from her job, Roby receives financial help and support in the amount of $275 from her children. *Id.* With that support, Roby's total monthly income is $2,262.43. *Id.* Her monthly expenses are $1,655, leaving a net monthly income of $607.43. *Id.*

In Roby's proposed plan, as amended, she proposes to pay TitleMax $8,700 with interest rate of 15%. (Roby; Doc. 20). The plan states the value of the vehicle is $14,900. *Id.* Roby's Schedules reveal that her secured debts total $40,850. (Roby; Doc. 14). Included in that total is a debt secured by another vehicle, a debt in the amount of $25,000 secured by Roby's home, and a priority debt to the IRS in the amount of $7,445. (Roby; Docs. 14 and 20). A proof of claim was not filed regarding Roby's mortgage, but her proposed plan provides $505 will be paid directly to Mortgage Corporation of the South each month. (Roby; Doc. 20). Along with these debts, Roby's plan proposes to pay unsecured creditors at a rate of 100% over a term of 56 months. *Id.*

TitleMax objects to confirmation of Roby's proposed plan arguing (1) the plan cannot be confirmed because of Roby's bad faith, and (2) the pawn agreement is void for

fraud. (Roby; Doc. 18). An evidentiary hearing was held September 8, 2021. (Roby; Doc. 55). At the evidentiary hearing, Roby testified she had been doing business with TitleMax for approximately five or six years. (Roby; Doc. 70, page 7). Roby testified that she "always paid them back." *Id.* Roby testified that she met with a bankruptcy attorney prior to entering into the last pawn agreement. Yet, her testimony conveyed that whether to file bankruptcy seemed to be a decision with which she struggled.[3]

### B. Kimberly Hope Arnett—Case No. 21-31026

The relationship between TitleMax and Kimberly Hope Arnett ("Arnett") goes back to at least November 2020. (Arnett; Doc. 55). Prior to the final pawn agreement at issue in this case, Arnett entered into a pawn agreement and pawned the title to her 2013 Kia Forte to TitleMax on March 24, 2021. (Arnett; Doc. 20). Under that agreement Arnett was to repay $4,825 plus a pawnshop charge of $530.27 on or before April 23, 2021. *Id.* Arnett was unable to repay this amount and her vehicle was repossessed. (Arnett; Doc. 55). To regain her vehicle, Arnett paid a portion of the principal owed from the prior agreement. *Id.* After that principal payment, she refinanced the remaining amounts owed on the prior agreement and agreed to pay $2,935.54, plus a pawn shop charge of $322.62, on or before July 14, 2021. (Arnett; Doc. 20). The same day she signed the final agreement with TitleMax, Arnett completed credit counseling and filed a Chapter 13 bankruptcy petition. (Arnett; Doc. 1).

---

[3] When asked if she intended to file, Roby said "I was thinking about it and after – as I had – my mind was so messed up, Your Honor, during that time, yes." (Roby; Doc. 70, page 12). When asked if she mentioned any intention about filing a bankruptcy petition to TitleMax, she answered: "No, because I was -- my mind was so all wound up, I was so confused." *Id.*

4

Arnett is a first-time bankruptcy filer. Arnett's Bankruptcy Form 106, filed with the petition, summarizes her assets are valued at $24,597.53 while her liabilities total $34,945.50. (Arnett; Doc. 1). Arnett is a Project Management Analyst at CGI Tech and Solutions, Inc. where she has worked for five years. Arnett has a spouse and one minor dependent. Form 106 provides that her take home pay, combined with her spouse's, is $4,042.73 and expenses are $3,928.54 for a net monthly income of $114.19. *Id*. Schedules reveal that, within the year preceding filing her Chapter 13 petition, Arnett was subject to a garnishment action in the Circuit Court of Pike County (SM 2020-900600.00). (Arnett; Doc. 37). The 2013 Kia Forte, valued at $6,425, is the only vehicle on Arnett's Schedules. *Id*. Arnett testified that this is her only vehicle, and she uses it to travel to and from work. (Arnett; Doc. 55). Arnett's plan, as amended, proposes plan payments of $87 bi-weekly over the course of 58 months. (Arnett; Doc. 12). The plan proposes to cure arrears to Troy Bank & Trust for Arnett's home mortgage and a default to Gadsden Music Company. *Id*. Arnett proposes to pay TitleMax as a secured creditor and lists the amount of the debt as $3,500 with an interest rate of 3.25%. Unsecured creditors are to receive zero percent under Arnett's proposed 58-month plan. *Id*. TitleMax objects to Arnett's proposed plan arguing (1) the plan cannot be confirmed because of Arnett's bad faith and (2) the pawn agreement dated June 14, 2021, is void for fraud. (Doc. 20). An evidentiary hearing was held October 20, 2021. (Arnett; Doc. 29).

### C.    Lentonius Faryett Smith—Case No. 21-31053

Lentonius Faryett Smith ("Smith") entered into his final pawn transaction with TitleMax on June 17, 2021, whereby he pawned the title to his 2007 Saturn Aura. (Smith;

5

Doc. 16). Smith did not accept any new money at that time. *Id.* This final agreement was not his first transaction with TitleMax; instead, the final agreement renewed a prior pawn agreement that had matured on June 6, 2021. (Smith; Doc. 16). In the final transaction, Smith refinanced the amount owed from the prior agreement and agreed to repay $1,339.45 plus a pawn shop fee of $227.57, on or before July 17, 2021. *Id.*

Smith testified that he met with bankruptcy counsel for the first time on June 18, 2021. (Smith; Doc. 45, page 6). Smith completed credit counseling on June 18, 2021, and filed a Chapter 13 bankruptcy petition on June 19, 2021. (Smith; Doc. 1). This was Smith's first time seeking the protection of bankruptcy. Smith's Bankruptcy Form 106 states his assets are valued at $4,637 while his liabilities total $8,501. *Id.* Schedules reveal Smith is unmarried with no dependents. His gross monthly income that he receives as an employee of the city of Troy is $2,321.12. Smith's take home pay is $1,849 monthly and his monthly expenses are $1,775, which leaves a net monthly income of $74. The 2007 Saturn Aura valued at $3,037 is the only vehicle listed in his Schedules. *Id.* Smith testified that this was his only vehicle, and that he used it for traveling to and from work. (Smith; Doc. 45).

In his amended plan, Smith proposes to pay TitleMax as a secured creditor and lists the amount of the debt as $1,850 with an interest rate of 5.25%. (Smith; Doc. 21). The plan also proposes to pay the secured claim of Wiregrass Community and rejects a lease with Rent-A-Center. Unsecured creditors, whose claims total $3,860, are to receive zero percent under Smith's proposed 48-month plan. (Smith; Doc. 21). TitleMax objects to Smith's proposed plan arguing (1) the plan cannot be confirmed because of Arnett's bad

6

faith and (2) the pawn agreement dated June 17, 2021 is void for fraud. (Smith; Doc. 16).

An evidentiary hearing was held October 20, 2021. (Smith; Doc. 27).

## III.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.   Brief Summary of Relevant Eleventh Circuit Precedent

At the crux of the issue here is the interplay of the timing of the pawn agreements, bankruptcy petition filings, and how that timing affects what interests come into a bankruptcy estate. The precedential opinions on the issue are few, but notable, and relevant here are the following: *In re Northington*, 876 F.3d 1302, 1315 (11th Cir. 2017) and *In re Womack*, 616 B.R. 420, 426 (Bankr. M.D. Ala. 2020), *aff'd sub nom. TitleMax of Alabama, Inc. v. Womack*, No. 2:20-CV-416-WKW, 2021 WL 1343051 (M.D. Ala. Apr. 9, 2021), *aff'd sub nom. In re Womack*, No. 21-11476, 2021 WL 3856036 (11th Cir. Aug. 30, 2021). Summarized below, these cases offer different strategies and outcomes based on key timing aspects related to the pawn agreements and the bankruptcy petitions.

The defining distinction between whether *In re Northington* or *In re Womack* applies hinges on the maturity date of a pawn agreement. The timing is critical because under *In re Northington*, if a debtor files a bankruptcy petition after the pawn agreement's maturity date but within the redemption period under state law, the right of redemption becomes part of the bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1). 876 F.3d at 1315. Whatever remains of the redemption period under state law is extended by 11 U.S.C. § 108(b) for sixty days from the petition date, and within that extended period, the estate maintains a redemption interest in the vehicle. The Eleventh Circuit concluded that upon expiration of the extended redemption period, the interest in the vehicle is forfeited to the

7

pawnbroker, and the vehicle ceases to be property of the bankruptcy estate. *In re Northington*, 876 F.3d at 1315. In short, under *In re Northington*, a debtor cannot pay what is owed under a pawn agreement along with other debts in a proposed plan because, upon expiration of the redemption period, an automatic forfeiture occurs and neither debtor nor the estate have any rights in the vehicle, "possessory or otherwise." *Id.* Thus, if a debtor desires to keep the pawned vehicle, a debtor's only option is to redeem the vehicle within sixty days of filing the bankruptcy petition.

The bankruptcy court in *In re Womack* distinguished *In re Northington* and found that, when a pawn contract has not yet matured, "the property interests that became property of the estate were not mere rights of redemption, but ownership rights." *In re Womack*, 616 B.R. at 427. To fit within the *In re Womack* distinction, the pawn agreement must not have reached its maturity date when the bankruptcy petition is filed. Prior to maturity of the agreement, a debtor is not yet in default and maintains legal title and rights to the vehicle while the pawn broker is treated as a typical lienholder. The Eleventh Circuit specified this creates a "fixed interest in [the] vehicle [which] is distinguishable from the contingent interest that the debtor had in *Northington*." *In re Womack*, 2021 WL 3856036, at *3. Thus, by filing a bankruptcy petition before the pawn agreement matures, the security interest that comes into the estate is one a debtor can modify in a Chapter 13 plan. *In re Womack*, 616 B.R. at 426.

Here, Debtors renewed their pawn agreements and filed Chapter 13 bankruptcy petitions prior to the maturity dates set forth in the pawn agreements. Accordingly, all three Debtors propose to modify the rights of TitleMax in their Chapter 13 plans as afforded

8

under *In re Womack*. TitleMax alleges that Debtors acted in bad faith by utilizing this protection and renewing their pawn agreements shortly before filing bankruptcy petitions.

### B.     Procedural Hurdles Prevent a Fraud Determination

In addition to allegations that Debtors lack good faith, TitleMax's objection in each case alleges that the pawn agreements should be void for fraud.  The pawn agreements contain various acknowledgements and representations, and central to the issues here, Paragraph 22(j) states: "By signing this Agreement, Pledgor represents, warrants, acknowledges and agrees as follows . . . You are not a debtor in bankruptcy. You do not intend to file a federal bankruptcy petition." (Roby; Doc. 48).  Because of the proximity in timing between the final agreements and filing of petitions, TitleMax argues that the pawn agreements were induced by Debtors' fraudulent misrepresentations that he or she did not intend to file bankruptcy.  Although not raised in the written objections, TitleMax argued in court that, alternatively, under Paragraph 8 of the pawn agreement, Debtors breached and were automatically in default based on the following language: "You also will be in default if you made any false representation warranty, promise, or provision in or in connection with entering into this Agreement." (Smith; Doc. 16-2).  In sum, TitleMax argues that because Debtors spoke with bankruptcy counsel and/or completed credit counseling prior to or soon after renewing the pawn agreements with TitleMax, Debtors were attempting "to thwart the normal operation of the Alabama Pawnshop Act, and to defraud TitleMax." (Smith; Doc. 16).

Citing only state law, TitleMax focuses on the language of Paragraph 22(j) and argues that the pawn agreements should be void and/or were breached and that because the

9

final agreements were voided or breached, the Court must look back to the prior agreements. Doing so would mean the estate's interests would be subject to *In re Northington* instead of *In re Womack*. However, TitleMax has only made these arguments through an objection to confirmation of Debtors' plans. A general allegation of fraud or breach of contract is not a typical basis for an objection to confirmation because determining a pre-petition contract is void on any basis is a legal determination distinct from plan confirmation. At this juncture, the Bankruptcy Court is tasked with determining whether the plans are ripe for confirmation, not whether a breach of contract occurred prior to the bankruptcy filing (or was voided by the alleged present intent of Debtors). *In re Jensen*, 369 B.R. 210, 234 (Bankr. E.D. Pa. 2007) ("[O]rdinarily, the existence of a claim for breach of contract is not a basis for denying confirmation of a chapter 13 plan."). In this confirmation proceeding, it is this Court's job to determine whether Debtors filed their petitions and plans in good faith and in compliance with 11 U.S.C. § 1325. In that regard, TitleMax's fraud argument regarding Debtors' pre-petition conduct is, at best, an argument against Debtors' good faith under §§ 1325(a)(3) and (a)(7). The record further supports this interpretation. Specifically, counsel for TitleMax stated at the hearing: "It is more or less a good faith objection, Your Honor. It kind of boils down to whether the Debtor breached the terms of the Pawn Agreement when she signed it, and so that sort of essentially becomes a good faith objection." (Arnett; Doc. 55, page 3).

Moreover, TitleMax must do more than generally allege fraud or argue Debtors' bankruptcy filings were breaches of the agreements. First, "[a] mere breach of a contractual provision is not sufficient to support a charge of fraud." *Brown-Marx Assocs., Ltd. v.*

*Emigrant Sav. Bank*, 703 F.2d 1361, 1371 (11th Cir. 1983); *ADTRAV Corp. v. Duluth Travel, Inc.*, No. 2:14-CV-56-TMP, 2016 WL 4614842, at *21 (N.D. Ala. Sept. 6, 2016) ("Under Alabama law, it is clear that to assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud.") (citations omitted).[4] TitleMax did not demonstrate how the alleged misrepresentations are independent from the promises in the contract. Likely because its true focus is on good faith, TitleMax did not set forth or address the necessary elements to prove fraud. As the party alleging fraud, TitleMax has the burden to prove each element of fraud, deceit, and/or fraudulent inducement. *Patel v. Hanna*, 525 So. 2d 1359, 1360 (Ala. 1988) (discussing a plaintiff's burden regarding fraud); *Whitlow v. Bruno's, Inc.*, 567 So. 2d 1235, 1241 (Ala. 1990) (discussing a plaintiff's burden related to the elements of deceit). TitleMax only generally asserts "fraud" and "fraudulent inducement" and merely quotes *Farmers Ins. Exch. v. Morris* as follows: "[W]hen an agreement has been induced by *deliberate* fraud, the written document reciting that agreement is void and is of no more binding efficacy . . . than if it had no existence, or were a piece of waste paper." (Smith; Doc. 16) (quoting *Farmers Ins. Exch. v. Morris*, 228 So. 3d 971, 983 (Ala. 2016)) (emphasis added). TitleMax does not cite to any specific statute (state or bankruptcy), list elements, or argue with particularity its claims related to fraud.

---

[4] *Am. Econ. Ins. Co. v. Fort Deposit Bank*, 890 F. Supp. 1011, 1016 n.7 (M.D. Ala. 1995) ("It is long established in Alabama that 'the law of the state wherein the contract was executed is determinative of the rights and liabilities of the parties to the contract.'") (citing *Harrison v. Insurance Company of North America*, 294 Ala. 387, 391, 318 So.2d 253, 257 (1975); *Furst & Thomas v. Sandlin*, 208 Ala. 490, 94 So. 740 (1922)).

It is not even clear whether TitleMax is alleging actual fraud or fraudulent inducement as it uses both allegations interchangeably without reference to or reliance on any specific law or code section. Critical here, TitleMax did not set forth how pre-petition fraud or fraudulent inducement claims could be an independent basis to object to plan confirmation, nor did TitleMax propose a jurisdictional or procedural mechanism by which this Court may invalidate a pre-petition contract based on pre-petition conduct. Even if the Court were to ignore the procedural hurdles here, it is unlikely TitleMax could meet its burden in establishing fraud or fraudulent inducement due to the limited argument and conclusory allegations presented to the Court.[5]

Accordingly, this Court will address the alleged fraud in the context of Debtors' good faith in filing their petitions and plans; however, because TitleMax did not establish the procedural or jurisdictional grounds by which this Bankruptcy Court can void a pre-petition contract, this Court will not independently evaluate fraud as a separate legal basis to void the contracts.

### C. The Two Prongs of Good Faith

Among other criteria, a bankruptcy court "shall confirm a plan if" it is "proposed in good faith" and if "the action of the debtor in filing the petition was in good faith." *See* 11

---

[5] Under Alabama law, "[f]raud in the inducement consists of one party's misrepresenting a material fact *concerning the subject matter of the underlying transaction* and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." *Farmers Ins. Exch. v. Morris*, 228 So. 3d 971, 978 (Ala. 2016) (citations omitted) (emphasis added). Moreover, the reliance must be "reasonable" which is determined "based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *Id*. at 979.

U.S.C. §§ 1325(a)(3) and (a)(7). Thus, when questioned, a bankruptcy court is tasked with making two good faith determinations. The two determinations yield different potential outcomes—dismissal of the case for cause under § 1307(c) or an opportunity to propose an amended plan.[6] *Matter of Beasley*, No. 18-04268-DSC13, 2019 WL 3403361, at *16 (Bankr. N.D. Ala. July 3, 2019) ("[W]hile a determination that a petition has not been filed in good faith would likely result in dismissal, a determination that a plan has not been filed in good faith would, in most cases, result in an opportunity to propose another plan.") (citing *In re McCreary*, No. 09-81743, 2009 WL 5215587, at *2 (Bankr. C.D. Ill. 2009)).

Even though there are two distinct good faith determinations required (good faith in filing a petition and good faith in proposing a plan), good faith is not expressly defined in the Bankruptcy Code. Generally, the good faith requirements are in keeping with the Bankruptcy Code's central purpose of affording a "fresh start" to only "honest but unfortunate" debtors, not to those seeking a "greedy and unworthy purpose" or perpetrating a "malevolent scheme." *See generally In re Waldron*, 785 F.2d 936, 941 (11th Cir. 1986) (finding bad faith when financially stable debtors filed Chapter 13 but had "no real need for the bankruptcy process" and their "only motive was to enhance their financial coffers by manipulating and abusing the bankruptcy process."). While not identical, many indications of good or bad faith overlap when looking at 11 U.S.C. §§ 1325(a)(3) and (a)(7). *In re O'Neal*, No. 11-13535-WHD, 2012 WL 1940594, at *6 (Bankr. N.D. Ga. Apr. 13, 2012) ("Some overlap in the factors may exist, however, as both requirements serve to

---

[6] TitleMax has not requested that any of these cases be dismissed for lack of good faith.

ensure that a debtor does not use Chapter 13 to abuse 'the provisions, purpose, or spirit of [Chapter 13]. . . .'" (citing *In re Love,* 957 F.2d 1350, 1357 (7th Cir. 1992)).  Here, TitleMax's objections to confirmation of Debtors' plans touch on bad faith in filing of the petition and in filing of the plan; thus, the Court will address Debtors' good faith as to each.

### i.  Good Faith in Filing a Petition

Section 1325(a)(7) of the Bankruptcy Code requires a finding that a debtor filed the petition in good faith.  11 U.S.C. § 1325(a)(7).  This requirement was an addition to the pre-BAPCA requirement that a debtor propose a plan in good faith under § 1325(a)(3). Nevertheless, even before the requirement of good faith in filing the petition was codified by § 1325(a)(7), it was something typically considered in a court's good faith analysis.[7]

A debtor's good faith in filing a petition is determined by the bankruptcy court on a case-by-case basis, and the court must consider the totality of the circumstances in making its determination.  *Gen. Lending Corp. v. Cancio*, 578 F. App'x 832, 834-35 (11th Cir. 2014); *In re Brown*, 742 F.3d 1309, 1317 (11th Cir. 2014).  As to the filing of the petition itself, "[a]t bottom, the essential question before the Court is whether the debtor filed the petition for a 'greedy and unworthy purpose.'"  *In re O'Neal*, 2012 WL 1940594, at *6 (citing *In re Waldron*, 785 F. 2d at 941).  At confirmation, a debtor has the burden of proof to satisfy each element necessary for confirmation and this includes establishing that the petition was filed in good faith.  *In re Beasley*, No. 11-40642-JJR13, 2011 WL 4498942,

---

[7] Prior to the codification of good faith in filing a petition, the Eleventh Circuit recognized the necessity of good faith in motivations for filing and stated "'the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose or spirit of [the chapter] in the proposal.'"  *In re Kitchens*, 702 F.2d 885, 888 (11th Cir. 1983) (quoting 9 *Collier on Bankruptcy* ¶ 9.20 at 319 (14th ed. 1978)).

at *2 (Bankr. N.D. Ala. Sept. 27, 2011) (finding that the case was not filed in good faith when discharge was unattainable, and debtors could only "bide their time and enjoy temporary protection from creditors under [C]hapter 13"). In sum, the Court is tasked with confirming a debtor's intentions are sincere and not sinister. *Matter of Chapman*, No. 17-30427 JPS, 2019 WL 262198, at *5 (Bankr. M.D. Ga. Jan. 17, 2019) (asking if debtors filed "with the honest intent and genuine desire to utilize the provisions of Chapter [13] for its intended purpose–to effectuate . . . reorganization–and not merely as a device to serve some sinister and unworthy purpose of the [debtors].") (citing *Rivas v. Bank of New York Mellon (In re Rivas)*, 682 Fed. Appx. 842, 845 (11th Cir. 2017)). Many creditors suffer altered rights and remedies when a debtor files bankruptcy, but "the good faith requirement serves to prevent undeserving debtors from benefiting from the Chapter 13 superdischarge." *In re Vick*, 327 B.R. 477, 487 (Bankr. M.D. Fla. 2005), *subsequently dismissed*, 233 F. App'x 897 (11th Cir. 2007). In upholding this requirement, the Court considers "objective evidence of a fundamentally unfair result and subjective evidence that a debtor filed a petition for a fundamentally unfair purpose." *Matter of Beasley*, 2019 WL 3403361, at *17 (quoting *In re McCreary*, 2009 WL 5215587, at *3).

Another topic considered in the good faith inquiry is whether a debtor may have been better suited in a Chapter 7 as opposed to a Chapter 13. *See In re Brown*, 742 F.3d at 1319 (affirming a bankruptcy court's finding of bad faith when "the bankruptcy court found [Debtor's] Chapter 13 plan was not proposed in good faith because: the totality of the factual circumstances showed [Debtor] was best served by a Chapter 7 bankruptcy; only [Debtor]'s attorney benefitted from proceeding under Chapter 13; and [Debtor] was likely

15

to default in his Chapter 13 case and end up without a discharge."). The evidence in these cases supports that Debtors' financial situations were dire, and that they could benefit from bankruptcy relief. Unlike *In re Brown*, these Debtors are adjusting and repaying debts, preserving assets, and not only paying attorney's fees. *See id.* at 1313. Debtors accurately stated their incomes and debts and are making good faith efforts to satisfy their creditors' claims in order to obtain fresh starts. There was no argument that Debtors should have sought relief under Chapter 7 as opposed to Chapter 13, and the record supports that Debtors are better served reorganizing through a Chapter 13 as opposed to a Chapter 7 liquidation.

TitleMax's fraud arguments revolve around the formation of pre-petition contracts which the Court construes as an allegation of bad faith in filing of the petition. In determining good faith, a court considers pre-petition and post-petition conduct. *Matter of Beasley*, 2019 WL 3403361, at *17. However, because a court determines good faith based on the totality of the circumstances, pre-petition conduct alone is not determinative on the issue of good faith. *Id.* (citing *In re Wilcox*, 251 B.R. 59, 67 (Bankr. E.D. Ark. 2000). Instead, pre-petition conduct may be overcome by other factors when the overall filing of the petition and the plan were done in good faith. *In re Wilcox*, 251 B.R. at 69 (finding the debtors' "efforts to fund a sixty-month plan with all available disposable income, their accurate schedules, and their genuine need for chapter 13 relief outweigh the detrimental effect of their pre[-]petition conduct."); *see also In re Nipper*, 224 B.R. 756, 759 (Bankr. E.D. Mo. 1998).

Here, there was no evidence or testimony presented that Debtors do not genuinely need bankruptcy relief or are not making their best efforts. Debtors have accurately scheduled their income and their debts and proposed repayment to the satisfaction of all but one creditor—TitleMax. TitleMax would have the Court look solely at the treatment of this one debt, but, while a piece of the puzzle, that is not this Court's only task. The totality of the circumstances requires more. Moreover, this Court does not find that utilizing the protections offered by the Bankruptcy Code and *In re Womack* translates to filing a petition for a "fundamentally unfair purpose," nor does it lead to "a fundamentally unfair result." *Matter of Beasley*, 2019 WL 3403361, at *17.

For comparison, in *In re O'Neal*, a divorced debtor filed a Chapter 13 petition primarily to deal with only one debt, but he was not otherwise in financial distress. 2012 WL 1940594, at *7. Specifically, the debtor waited until the eve the debt at issue was due, filed a bankruptcy petition, and proposed to pay the debt through the plan over five years. Unlike Debtors here, O'Neal's financial well-being was stable. Apart from the looming due date, O'Neal was not otherwise in financial distress. Yet, the bankruptcy court in *In re O'Neal* recognized that "[i]f the Debtor had not filed bankruptcy prior to the due date of the obligation, he would have been in financial distress. Given the Debtor's lack of alternative, the Court finds nothing inequitable about the Debtor's decision to file a petition to prevent himself from being in contempt of the Decree." *Id.* Instead of finding bad faith based on the timing of the filing in *In re O'Neal*, the court likened the situation to one in which a person files a bankruptcy petition to avoid impact of a judgment, garnishment, or foreclosure. *Id.* ("Aside from being a bit more proactive, it is really no different than filing

a petition to avoid the impact of a judgment, an ongoing garnishment, or a pending foreclosure."). Like *In re O'Neal*, this Court finds the timing of the filing, even if strategic, is not necessarily indicative of bad faith. Absent other indications of abuse, utilizing bankruptcy strategies in accordance with changes and uncertainties in the law is not bad faith. Specifically, in *In re Murphy*, the court found a debtor's petition and plan were filed in good faith over the objection of a "910 claimant" even though the debtor dismissed a prior case and filed a new petition 915 days after acquiring a vehicle, which put the 910 claimant outside the time frame to receive special treatment under 11 U.S.C. § 1325(a). 375 B.R. 919, 923 (Bankr. M.D. Ga. 2007). While acknowledging the uncertainty in the law regarding 910 claims at the time, the court found that the debtor's "attempt to obtain the most favorable terms" in bankruptcy was not bad faith given the totality of the circumstances. *Id*.

Moreover, the Court recognizes that the timing of Debtors' final agreements with TitleMax and the filing of their petitions was likely influenced by Debtors' attorneys. For example, Roby's attorney stated in open court that it was his intent to bring the agreement under *In re Womack* in order to "protect this debtor's car so she would not suffer forfeiture of the vehicle." (Roby; Doc. 70). However, when determining good faith, a court looks to the *debtor's* motives, dealings, and intentions. Debtors' testimonies did not convey that they comprehended the legal effects their timing had on the treatment of the debts to TitleMax or that they understood how the timing of the renewals would subject the agreements to treatment under *In re Womack* instead of *In re Northington*. In these cases, each Debtor faced financial distress and sought advice of bankruptcy counsel. There was

no evidence to support that Debtors came to bankruptcy counsel with plans or intentions to deceive or defraud TitleMax. Instead, the records better support that bankruptcy counsel surveyed Debtors' incomes, their current debts, and proposed a bankruptcy strategy permitted by the Bankruptcy Code and Eleventh Circuit case law precedent that would allow Debtors to retain their vehicles while repaying the debt. In considering the circumstances in totality, the Court is not persuaded that Debtors' use of the protections provided by the Bankruptcy Code and precedent in the Eleventh Circuit equates to "unmistakable manifestations of bad faith." *See In re Waldron*, 785 F. 2d at 941.

Additionally, TitleMax points to evidence that Roby completed credit counseling prior to renewing her final agreement and that Smith had printed financial documents necessary for preparation of his bankruptcy petition. Section 109(h)(1) of the Bankruptcy Code requires a debtor to have completed credit counseling within the 180 days *preceding* the filing of a petition. 11 U.S.C. § 109(h); *In re Sussman*, 816 F. App'x 410, 415 (11th Cir. 2020) ("An individual may not be a debtor in bankruptcy court unless that individual has received credit counseling from a nonprofit budget and credit counseling agency."); *In re Echeverry*, 720 F. App'x 598, 601 n.1 (11th Cir. 2018). While the Court understands that Debtors took some actions in preparing to file bankruptcy prior to renewing the pawn agreements at issue, it is not persuaded that these actions viewed in the totality indicate bad faith here. Failure to complete pre-petition credit counseling renders one ineligible to be a debtor and is grounds for dismissal. *In re Wood*, 2013 WL 1969303, at *1 (Bankr. S.D. Ga. May 13, 2013) (finding debtor ineligible based on failure to receive pre-petition counseling and dismissing case); *In re Coley*, 2009 WL 2030435, at *1 (Bankr. M.D. Ala.

July 6, 2009) ("The [§ 109(h)] requirement is mandatory, and the case must be dismissed."). Thus, a debtor must complete credit counseling and they have up to six months before filing a petition to do so. Given that length of time, this Court is hesitant to find the timing of a debtor's credit counseling alone as indicative of a present intent to file bankruptcy because such a finding could lead to an arbitrary rule in future cases regarding the time between pre-petition agreements and credit counseling completion.

Arnett and Smith testified they intended to file bankruptcy, but the testimony does not support that they wholly understood the legal implications of their timing on TitleMax's position. For instance, when questioned about her timing and intentions, Roby testified she was "confused." (Roby; Doc. 70). Smith's testimony also indicated that he lacked understanding regarding the chronology of events. Arnett's circumstances reveal that she was dealing with other exigencies (e.g., mortgage arrears) that support her impetus to file a bankruptcy petition. The Court does not have a basis to conclude on the record before it that these Debtors were intentionally deceptive or that they even understood the timing issues at play between *In re Northington* and *In re Womack*.

The facts before the Court support that Debtors' net incomes are nominal.[8] The testimony by Debtors portrayed that they desired to avoid financial distress while working to repay their creditors to the best of their abilities. Specifically, Roby's attorney asked: "is it your understanding this plan proposes to pay all creditors in full?" and Roby answered: "yes, sir." (Roby; Doc. 70, page 7). The testimony by each Debtor and the

---

[8] According to their Schedules, Roby's net monthly income is $607.43 (with the additional help from her children); Arnett's net monthly income in $114.19, and Smith's net monthly income is $74.

proposed plans support that Debtors intend to repay their debts and earn a discharge. The Court is not convinced that Debtors intended to deceive TitleMax when they entered into the final agreements. Instead, the circumstances portray that Debtors renewed a debt to retain their vehicles then proposed to repay those debts and the debts to other creditors through their Chapter 13 plans. The records support that Debtors are genuine in their desire for bankruptcy relief in that they are seeking "rehabilitation through debt repayment" not "debt avoidance through manipulation of the Code." *In re McGovern*, 297 B.R. 650, 660 (S.D. Fla. 2003) (finding bad faith where debtor's pre-petition conduct included threatening to file bankruptcy to avoid the debt). Viewing the totality of the circumstances here, the preponderance of the evidence supports that Debtors filed their petitions in good faith.

### ii. Good Faith in Filing a Proposed Plan (the *Kitchens* Factors)

In setting forth a baseline for courts to determine whether a debtor proposed a Chapter 13 plan in good faith, the Eleventh Circuit adopted the following eleven non-exclusive factors for bankruptcy courts to consider:

(1) the amount of the debtor's income from all sources;
(2) the living expenses of the debtor and his dependents;
(3) the amount of attorney's fees;
(4) the probable or expected duration of the debtor's Chapter 13 plan;
(5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;
(6) the debtor's degree of effort;
(7) the debtor's ability to earn and the likelihood of fluctuation in his earnings;
(8) special circumstances such as inordinate medical expense;
(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors;

(10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors; and

(11) the burden which the plan's administration would place on the trustee.

*In re Kitchens*, 702 F.2d 885, 888–89 (11th Cir. 1983). The Eleventh Circuit also noted that "other factors or exceptional circumstances may support a finding of good faith, even though a debtor has proposed no or only nominal repayment to unsecured creditors." *Id.* at 889. An objecting creditor has the initial burden to produce some evidence of lack of good faith. *Matter of Beasley*, 2019 WL 3403361, at *17. Yet ultimately, it is a debtor's burden to prove their good faith by a preponderance of the evidence. *Matter of Ogden*, 570 B.R. 432, 435 (Bankr. N.D. Ga. 2017), *amended*, No. 16-12280-WHD, 2017 WL 2124413 (Bankr. N.D. Ga. May 15, 2017). In deciding if a debtor has met their burden, "[t]he bottom line is whether the debtor is attempting to thwart his creditors, or is making an honest effort to repay them to the best of his ability." *In re Virden*, 279 B.R. 401, 409 (Bankr. D. Mass. 2002). The Court must look to the totality of the circumstances and can take note of other non-enumerated considerations. *In re Wade*, 598 B.R. 34, 44 (Bankr. N.D. Ga. 2019) ("*Kitchens* clearly encourages courts to engage in a totality of the circumstances analysis to determine a debtor's good faith.") (citing *In re Brown*, 742 F.3d at 1317; *In re Britt*, 211 B.R. 74, 78 (Bankr. M.D. Fla. 1997) ("The Court must consider all [of the factors] but not be limited to them. One factor favoring the conclusion of good faith is sufficient. The appropriate weight depends on the credibility of the debtor.") (citations omitted).

Viewing the totality of the circumstances here, most of the factors are not disputed, and, as set forth herein, those factors weigh in favor of finding good faith. As to the first

and second factors, the amounts of Debtors' income and expenses were not criticized, and the facts reveal that Debtors live reasonably without exorbitant or unnecessary expenses. There was no argument or evidence that Debtors have been anything but forthright in accurately disclosing their incomes, debts, and other necessary information to the Court. *In re Shelton*, 370 B.R. 861, 868 (Bankr. N.D. Ga. 2007) ("The easiest way to violate § 1325(a)(3) is to misrepresent, lie, or otherwise mislead the court.").

Next, the attorneys' fees being paid through the plans are the same as or less than the presumptive fee in this district and do not indicate any bad faith. The length of each Debtors' proposed plan is within the parameters of the Bankruptcy Code, and other than the objections by TitleMax, there are no other obstacles or objections to plan confirmation.

The fifth factor also supports Debtors' good faith. The facts and testimony support that Debtors were sincere in their motivations for seeking bankruptcy relief.[9] Importantly, TitleMax is not the sole creditor for any of these Debtors. Debtors are burdened with multiple debts, secured and unsecured, and are making reasonable efforts to repay what they are capable of paying. Schedules and plans reveal that each Debtor was in dire financial straits as evidenced by the debts and other creditors listed. For example, leading up to the filing, the record reveals that Arnett was behind on her mortgage, behind on a lease for personal property, had multiple unsecured debts, and had been subject to a garnishment. She testified that she filed her petition to "get my credit straight." (Arnett; Doc. 55, page 7). Similarly, Roby and Smith had other secured and unsecured debts

---

[9] While the timing of filing and bona fides with TitleMax are disputed, those issues will be further addressed with the tenth factor below.

without much income beyond their expenses. In fact, part of Roby's income is financial assistance that she receives from her adult children. (Roby; Doc. 14). Between the three Debtors, their net monthly income after expenses totals less than $800. There was no testimony that Debtors were not forthcoming with Trustee or the Court regarding assets, liabilities, or their Schedules. There are no allegations of concealed assets, improper transfers, falsified records, or other concerns that would reveal a lack of good faith or candor with the Court. While TitleMax focuses on the timing of the pawn agreements related to the timing of the filing, the Court's review of the records in their totality reveals Debtors did not file their petitions or plans solely to avoid the debts to TitleMax, but that they are sincere in their desire and need for bankruptcy relief.

In each of these cases Debtors propose to repay the renewed debts to TitleMax through their Chapter 13 plans. TitleMax's frustration with its treatment in the plan does not mean Debtors have acted with bad faith. *See In re Murphy*, 375 B.R. at 923 (Bankr. M.D. Ga. 2007). While perhaps the most *recent* creditor of each Debtor, TitleMax is not the only creditor in any of these cases. Just because one creditor stands to suffer more financially than other creditors does not alone establish bad faith. *Matter of Chapman*, No. 17-30427 JPS, 2019 WL 262198, at *5 (Bankr. M.D. Ga. Jan. 17, 2019) (finding that even though objecting creditor held 43 percent of the claims filed and some claims were potentially dischargeable because debtor filed Chapter 13 case as opposed to a Chapter 7, "that alone would not establish bad faith.").

Moreover, the degree of effort was not disputed in any of these cases. The facts and testimony support that each Debtor is employed and dutifully funds the plan. As of the

final evidentiary hearings, there were no objections regarding feasibility or poor pay records. Debtors all have the ability to earn and the facts establish that they are capable of consistently doing so while simultaneously funding their plans—neither TitleMax nor Trustee cited any concerns about lack of effort or any potential fluctuation in earnings. The Court notes that it carefully considered Debtors' histories here in that the undersigned recognizes these Debtors are not serial filers renewing debts and filing petitions with no prospect of receiving a discharge. Instead, Debtors are proposing repayment plans and consistently making payments so that they can receive discharges and, ideally, fresh starts. Notably, Roby is proposing to pay 100% to unsecured creditors in addition to her secured debts. (Roby; Doc. 20). As for prior filings, Roby is the only debtor with prior cases. Two of Roby's prior cases were filed over twenty years ago. Her most recent prior case was filed in 2016 and she received a discharge on June 29, 2020. (Roby; Case No. 16-33187). The Court does not find that Roby's previous completion of a case to discharge weighs against a finding of good faith here. Thus, the preponderance of the evidence supports that Debtors were sincere in filing their petitions to seek bankruptcy relief and not doing so for any unworthy or abusive purpose.

The tenth factor, which is the only one heavily argued by the parties, will be discussed further below. The eleventh and last *Kitchens* factor, does not indicate bad faith in any of the cases before the Court. There was no argument or evidence put forth that administration of these plans would place a burden on Trustee.

At central focus in all three cases here is the tenth factor which looks at the circumstances under which a debtor has contracted his debts and demonstrated his bona

fides in dealings with creditors. TitleMax centers its argument on the timing of each Debtors' final pawn agreement—in each case Debtor filed a bankruptcy petition within days or hours after renewing the pawn agreements. The Court cannot ignore that incurring a debt on the eve of bankruptcy may be indicative of bad faith. *See In re Crittenden*, 2009 WL 2424331, at *3 (Bankr. M.D. Ala. Aug. 6, 2009). However, these Debtors were not new customers of TitleMax. Roby, Arnett, and Smith all previously contracted with TitleMax months or years before filing a bankruptcy petition. While the Court grasps the "new agreement" versus "renewal" distinction, it is the situations and not the semantics that are enlightening here. The records support that, after the prior agreements' maturity dates, Debtors returned to TitleMax as they had many times before, made some payment to TitleMax, and renewed the prior agreements while declining any new money. The Court is aware that the timing of the renewals and the filing of the petitions may be suspicious and it may not condone this timing in all cases. However, the record does not support that Debtors were aware of the legal implications their timing had on the rights of TitleMax.

TitleMax also argues that because Debtors spoke with bankruptcy counsel and/or completed credit counseling prior to or soon after renewing the pawn agreements with TitleMax, Debtors were attempting "to thwart the normal operation of the Alabama Pawnshop Act, and to defraud TitleMax." (Smith; Doc. 16). In support, it argues that Roby "renewed on the app without speaking to anybody to have to discuss her situation." (Roby, Doc. 70, page 20). However, Debtor's use of a convenience offered by TitleMax does not make Debtor's renewal method indicative of bad faith or any ulterior intent to defraud or deceive. Moreover, Arnett and Smith both went to a TitleMax location, renewed

the pawn agreements with electronic signatures, and no evidence was presented that they were individually asked by a TitleMax representative about their financial circumstances or if they had any intentions to file bankruptcy.[10] Arnett testified that no one discussed the agreement with her even though she went to a TitleMax location. (Arnett; Doc. 55, page 7).[11] Smith's testimony indicated he may have been confused about whether he even signed an agreement, although he recalled making a payment. (Smith; Doc. 45, page 13). Looking at Debtors' intentions, Debtors' testimonies do not support a finding that they had actual knowledge of Paragraph 22(j) and with that knowledge intentionally induced TitleMax into renewing the pawn agreement in bad faith. As previously noted, there was no evidence presented that Debtors understood the potential effects the timing of the pawn renewal would have on TitleMax's rights in bankruptcy. Given the nature of the ongoing relationship between the parties and the pattern of their dealings, the Court does not find that Debtors lacked bona fides under these circumstances.

TitleMax further argues they were fraudulently induced into renewing these contracts and that Debtors acted in bad faith, but "[t]his is not a situation in which a

---

[10] The TitleMax representative testified TitleMax would not extend an agreement if a customer answered "yes" to the question about bankruptcy; but the paragraph in the pawn agreements at issue is not phrased as a question. (Roby; Doc. 70, page 17). The same representative also said three times that a "renewal" would be denied if a customer "mentions they're in bankruptcy." (Smith; Doc. 45, page 30). The TitleMax representative who testified was not at the store locations visited by Debtors. Her testimony does not support that she had any conversations with Debtors or reviewed the contracts at issue prior to or during the process. While knowledgeable about TitleMax's general internal and undocumented policy to not offer financing to those considering bankruptcy, this general knowledge is not in line with the language of the pawn agreements and there was no evidence or testimony that these questions were asked.

[11] The transcript from Arnett's hearing provides:
    "Q: And when you went into TitleMax how did you sign the agreement?"
    "[Arnett]: It was electronically."
    "Q: Okay. Did they go over that with you?"
    "[Arnett]: They didn't." (Arnett; Doc. 55).

sophisticated businessman enticed an uneducated novice into a bad deal." *In re Wiggins*, 250 B.R. 131, 135 (Bankr. M.D. Fla. 2000) (quoting *In re Thomas*, 217 B.R. 650, 654 (Bankr. M.D. Fla. 1998)).[12]  While not making a separate finding as to whether Debtors committed fraud or fraudulently induced TitleMax into the pre-petition agreements, the Court notes the actions are pre-petition conduct and, as discussed above, that conduct is to be considered in determining good faith. *In re Wilcox*, 251 B.R. at 69.  Even doing so here, Debtors' pre-petition behavior, viewed in the totality of the circumstances, does not result in a finding of bad faith in filing their plans. *In re Britt*, 211 B.R. 74, 78 (Bankr. M.D. Fla. 1997) ("A Chapter 13 plan may be confirmed despite the most egregious pre-filing conduct where other factors suggest that the filing of the plan nevertheless represents a good faith effort by the debtor to satisfy his creditor's claims.") (citing *Pioneer Bank of Longmont v. Rasmussen, (In re Rasmussen),* 888 F.2d 703 (10th Cir.1989) and *Neufeld v. Freeman,* 794 F.2d 149, 152 (th Cir.1986)).  Specifically, the court in *In re Britt* noted: "A lack of good faith in proposing a plan involves serious debtor misconduct or abuse such as fraudulent misrepresentation or serious nondisclosure of material facts *in filing the plan*." 211 B.R. at 78 (emphasis added).  Ultimately, that court confirmed the debtor's Chapter 13 plan despite the debtor's pre-petition act of embezzlement even though it acknowledged that the debtor's pre-petition embezzlement was "clearly against public policy." *Id*. at 79.  Yet, the court distinguished the debtor's pre-petition conduct from her motivations in filing her

---

[12] As addressed previously, TitleMax has not established a jurisdictional or procedural basis by which this Court may determine a pre-petition contract dispute at this confirmation hearing.  Yet, even if procedurally proper, TitleMax has not set forth the necessary elements in order to succeed on separate claims for fraud or fraudulent inducement.

petition and plan and found that "[t]he circumstances under which Ms. Britt contracted her debt does not show a lack of good faith in the filing of her proposed plan. She is using all of her disposable resources to maintain her Chapter 13 case and plan." *Id*. at 78. Important to the court's good faith determination, the court found that the debtor had "not sought to abuse bankruptcy law by employing it for a purpose for which it was not intended." *Id*. at 79. Here, a review of these records does not reveal egregious misconduct, abuse, or bad faith to warrant such treatment. Debtors did not approach a new creditor asking for an unsecured loan with intent to not pay it back; instead, Debtors refinanced prior debts and proposed to pay the refinanced amounts with pawn shop fees and interest as secured debts over the life of their Chapter 13 plans. While the renewals of the pawn agreements were close in time to the filing of the bankruptcy petitions, in viewing the totality of the circumstances, the facts support that Debtors are sincere in seeking to reorganize their debts. The evidence and testimony do not support that Debtors entered into the contracts with no intentions to perform. Debtors are not seeking to thwart their debts; instead, Debtors are repaying their debts to TitleMax and their other creditors as permitted by the Bankruptcy Code and Eleventh Circuit precedent. In doing so, they should be afforded the opportunity of a fresh start.

## IV.    CONCLUSION

Looking at the totality of the circumstances, the Court finds the preponderance of the evidence supports that Debtors filed their petitions and proposed their plans in good faith. Debtors were in obviously precarious financial conditions seeking to reorganize

multiple debts (not just those of TitleMax) and to obtain the financial relief and fresh start bankruptcy offers. The Court finds Debtors did so in good faith.

Based on the foregoing, it is hereby

ORDERED that TitleMax's objections to confirmation are OVERRULED. Debtors' plans are due to be confirmed and orders confirming the plans will enter separately.


Bess M. Parrish Creswell
United States Bankruptcy Judge


c: Debtors
   Earl Gillian, Jr., Attorney for Debtor Roby
   Michael Brock, Attorney for Debtor Arnett
   Stephen L. Klimjack, Attorney for Debtor Smith
   TitleMax, Creditor
   David A. Butler, Attorney for TitleMax
   Trustee